JOHN G. WILSON, Plaintiff and Counterdefendant-Appellee, v. FRANCIS S. WILSON III *et al.*, Defendants (Thomas S. Wilson, Intervenor Plaintiff; Francis S. Wilson III *et al.*, Counterplaintiffs and Third-Party Plaintiffs; JGT Company, Counterplaintiff and Third-Party Plaintiff-Appellant; Thomas S. Wilson *et al.*, Third-Party Defendants; Evanston Partners, Ltd., *et al.*, Third-Party Defendants-Appellees).

First District (3rd Division)   No. 1—90—1812

Opinion filed August 7, 1991.

Bell, Boyd & Lloyd, of Chicago, for appellant.

Burke, Wilson & McIlvaine, of Chicago, for appellees.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Plaintiff, John Wilson, brought an action seeking equitable remedies arising out of a business break-up. Defendants, Francis Wilson, Gregory Matic, and Highland Company, n/k/a JGT Company (Highland/JGT), filed a counterclaim, third-party complaints, and a motion for a temporary restraining order and a preliminary injunction to enjoin John Wilson and Evanston Partners from developing a medical office building without them. After a hearing, the trial court denied the motion for a preliminary injunction. On appeal, Highland/JGT argues that (1) the trial court erred in denying its motion for a preliminary injunction; and (2) the trial court erred in ruling that the 90-day termination notice of the consulting agreement effectively terminated the subsequent development agreement.

On July 8, 1985, John Wilson and Gregory Matic entered into a development consulting agreement (Consulting Agreement) for the purpose of working together on the proposed development of an Evanston, Illinois, medical office building and other projects. In September 1985, John Wilson, his brother, Francis Wilson, and Gregory

Matic formed Highland Development Company (Highland), an Illinois corporation, for the management and development of several real estate properties. On October 24, 1985, the three men organized Evanston Partners, Ltd., an Illinois limited partnership, and Evanston Partners, Inc., an Illinois corporation, which was to act as the general partner of Evanston Partners, Ltd., to organize the ownership of the proposed medical center. They initially proposed to sell limited partnership interests in Evanston Partners, Ltd., to obtain the equity capitalization needed to construct and develop the center. However, they were unable to sell any interests in the project.

On October 31, 1985, John Wilson assigned all of his rights and obligations under the July 1985 Consulting Agreement to Evanston Partners, Ltd., and Gregory Matic assigned all of his rights and obligations in the Consulting Agreement to Highland. On December 1, 1986, Evanston Partners, Ltd., and Highland entered into an agreement entitled "Amended and Restated Development Agreement" (Development Agreement), which was to be effective retroactive to July 8, 1985, the date of the Consulting Agreement. The 1986 agreement detailed Highland's expanded responsibilities and corresponding remuneration. By that time, Highland had located the property, negotiated terms of its purchase and of an architectural agreement, and assisted in obtaining financing for the medical center. Completion of the medical center was projected for December 31, 1988.

In the summer of 1988, the relationship between the three men had deteriorated and they decided to formally separate their interests in the project. On August 19, 1988, John Wilson and Francis Wilson entered into a written separation agreement in which John Wilson acquired all of Francis Wilson's interest in Evanston Partners, Ltd., and in Evanston Partners, Inc. In return, John Wilson conveyed to Francis Wilson all of his interests in various corporations where they held joint interests. At the same time, John Wilson entered into a similar separation agreement with Gregory Matic. Matic conveyed all of his interest in Evanston Partners, Ltd., and in Evanston Partners, Inc., in exchange for a $300,000 payment. John Wilson remained an officer of Highland until November 1988 and continues to be a director.

On July 3, 1989, John Wilson, as president of Evanston Partners, Ltd., sent Highland a 90-day notice, pursuant to the 1985 Consulting Agreement, terminating the 1986 Development Agreement. On July 7, 1989, Highland's name was changed to the JGT Company. On August 1, 1989, John Wilson filed suit against Gregory Matic, Francis Wilson, and Highland/JGT seeking an accounting and other equitable

relief. Subsequently, Francis Wilson, Gregory Matic, and Highland/JGT filed a counterclaim and a motion for a temporary restraining order and a preliminary injunction, in which they challenged John Wilson's right to develop the medical center without them. The motion sought to enjoin John Wilson, Evanston Partners, Inc., and Evanston Partners, Ltd., from: (1) attempting to develop, finance, or lease the medical center to the exclusion of Highland/JGT; (2) entering into development contracts, financing agreements, loans, leases, or any other development, financing documents, or leasing documents with respect to the medical center, without providing for and paying to Highland/JGT the fees and commissions to which it is entitled; and (3) representing to other persons that Highland/JGT is not the development, financing, or leasing agent for the medical center.

After a hearing, the trial court denied the motion for a temporary restraining order, finding that Highland/JGT did not prove that it had an ascertainable claim for relief to which it was likely to succeed on the merits, nor did it demonstrate irreparable harm or a lack of an adequate remedy at law. The trial court further ruled that the Consulting Agreement was incorporated by reference through the Development Agreement's recitals and preamble, or "therefore" clause, and that the "term" provisions in both agreements were not inconsistent. In addition, the trial court found that Highland/JGT's claims of harm to its goodwill did not state sufficient, specific, factual evidence to show irreparable harm and damage. There was no specific evidence of what Highland/JGT had done since October 1988 to garner goodwill, the trial court indicated. Furthermore, the trial court ruled, the conclusory statements that John Wilson was unable to sell interests in the medical center were not enough to support its argument. In fact, prior to October 1988, Highland/JGT was unable to sell any interests in the medical center project to outside investors.

The trial court also ruled that Highland/JGT did not show that money damages for breach of contract would not be an adequate remedy. Finally, the trial court balanced the equities, concluding that there would be more harm done by entering the restraining order, thus preventing the medical center project from continuing, than would be done by not entering the order.

Subsequently, based on the evidence from the temporary restraining order hearing, the trial court denied the motion for a preliminary injunction. The trial judge stated that based on the Development Agreement, there was not a fair chance of succeeding on the merits and no irreparable harm or damage was demonstrated. Highland/JGT

filed an interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)).

On appeal, Highland/JGT asserts that the trial court erred in denying its motion for a preliminary injunction. The purpose of a preliminary injunction is to prevent a threatened wrong or a continuing injury pending a full hearing on the merits of the case. (*H.K.H. Development Corp. v. Metropolitan Sanitary District of Greater Chicago* (1964), 47 Ill. App. 2d 46, 53.) Because a preliminary injunction is an extraordinary remedy (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 501), the status quo, which is the last, actual, peaceable, uncontested status preceding the controversy (*Baal*, 97 Ill. App. 3d at 502), is to be preserved with the least injury to the parties. *Grillo v. Sidney Wanzer & Sons, Inc.* (1975), 26 Ill. App. 3d 1007, 1011.

■ For a preliminary injunction to be granted, Highland/JGT must establish a protectable interest, a likelihood of success on the merits, an irreparable injury in the absence of injunctive relief, and no adequate remedy at law. (*American National Bank & Trust Co. v. Chicago Title & Trust Co.* (1985), 134 Ill. App. 3d 772, 776.) Generally, the grant of the temporary relief should outweigh any possible injury which the defendant might suffer by its issuance. *Greenspan v. Mesirow* (1985), 138 Ill. App. 3d 294, 300.

Highland/JGT claims a protectable interest based on the Development Agreement between Highland and Evanston Partners. In reliance on that agreement, Highland/JGT asserts, Highland/JGT, Francis Wilson, and Greg Matic invested considerable time and substantial amounts of money, which they expected to recoup by earning fees and commissions under the agreement. Highland/JGT also asserts a legitimate interest in protecting its corporate goodwill arising from the medical center project's close identification with Highland/JGT, its reputation, and its future competitive position. Finally, Highland/JGT contends, it has a legitimate interest in preventing John Wilson, a director of Highland/JGT, from violating his fiduciary duties to Highland/JGT.

John Wilson and Evanston Partners respond that the Consulting Agreement was incorporated by reference into the Development Agreement. Once that agreement was terminated in July 1989, John Wilson and Evanston Partners claim, Highland/JGT no longer had an ascertainable right which must be protected.

Whether Highland/JGT has a protectable interest and would likely succeed on the merits of the case depends on whether the Development Agreement replaced and superseded the Consulting Agreement or whether the Consulting Agreement was incorporated by reference

into the Development Agreement through the preamble, or "therefore" clause. If the Development Agreement replaced and superseded the Consulting Agreement, the 90-day termination notice would be ineffective. If, however, the Consulting Agreement was incorporated by reference, the 90-day notice effectively terminated the Development Agreement and any interests Highland/JGT previously had.

Highland/JGT argues that various provisions of the Development Agreement establish that it superseded the Consulting Agreement: its title and retroactive effective date; paragraph 11A (extent of agreement); recitals and preamble; and inconsistencies in the functions, terms and compensation provisions. A court must consider the contract in the context of the entire agreement. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283.) The determinative factor is the intention of the parties, which can best be determined by considering the contract as a whole, reviewing each part in light of the others. *Boatmen's National Bank v. Smith* (7th Cir. 1987), 835 F.2d 1200, 1203.

■ There is no merit to Highland/JGT's arguments that the Development Agreement's title and its retroactive effect to the Consulting Agreement's date are evidence that it superseded the Consulting Agreement. The title of the Development Agreement, "Amended and Restated Development Agreement," is ambiguous since "amended" and "restated" are contradictory terms. Neither the title nor the retroactive effective date demonstrates that the parties intended to start over again, instead of merely altering the Consulting Agreement.

Highland/JGT also asserts that the Development Agreement's paragraph 11.A established that the parties intended for the Development Agreement to totally replace the Consulting Agreement. Paragraph 11.A provides:

"11. *Extent of Agreement*:

A. *Entire Agreement*. This Agreement represents the entire agreement between the Owner and Highland with respect to the subject matter hereof, and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both the Owner and Highland."

Relying on *Courtois v. Millard* (1988), 174 Ill. App. 3d 716, Highland/JGT contends that this provision makes the Development Agreement a complete, valid, written contract, which merges and supersedes all prior agreements dealing with the same subject matter, including the Consulting Agreement. In *Courtois*, the parties entered into two separate real estate installment contracts involving the same

property. (174 Ill. App. 3d at 720.) The second contract was drafted more specifically and contained several provisions that were inconsistent with the first contract, suggesting that the parties intended for the second contract to control and to supersede the first contract. (*Courtois*, 174 Ill. App. 3d at 720-21.) Because the two contracts were distinguishable from each other and contained inconsistent terms, only one of the contracts was valid. (*Courtois*, 174 Ill. App. 3d at 721.) Therefore, the execution of the second contract terminated the legal effect of the first contract. *Courtois*, 174 Ill. App. 3d at 721.

The *Courtois* decision, however, is distinguishable because its first real estate contract was not incorporated by reference into its second contract. Furthermore, the court found that several provisions of the second contract were inconsistent with the first contract. *Courtois*, 174 Ill. App. 3d at 720.

■ Paragraph 11A must be interpreted in conjunction with the recitals and preamble. Paragraph 11A is a general provision where the recitals and preamble are specific provisions. When a contract contains both general and specific provisions relating to the same subject, the specific provision controls. *Boatmen's National Bank*, 835 F.2d at 1203.

■ Highland/JGT argues that the incorporation of the Consulting Agreement into the Development Agreement's recitals did not make it a binding obligation because it was not referred to in the operative portion of the agreement. Highland/JGT interprets recital A as merely giving the historical circumstances preceding the execution of the Development Agreement. While the preamble to the terms of the Development Agreement identifies the recitals as part of the prior general consideration for the agreement, Highland/JGT maintains they are distinguished from the operative provisions of the Development Agreement, which follow in the body of the agreement. Those operative provisions, Highland argues, contain no reference to the provisions of the Consulting Agreement and indicate no intent to incorporate any substantive provision of the Consulting Agreement into the Development Agreement.

John Wilson and Evanston Partners look exclusively to the Development Agreement's recitals and preamble to establish that the Consulting Agreement was expressly incorporated into the later agreement. By considering the preamble as an operative portion of the agreement, they argue that the terms of the Consulting Agreement became as much a part of the Development Agreement as if they were expressly written in it. They rely on cases that establish that preliminary recitals of an agreement become binding obligations when

referred to in the operative portion of the instrument in such a way that it was the contract's design that they should form a part of it.

The essence of the contract in *Wall v. Chicago Park District* (1941), 378 Ill. 81, 90-91, was the conveyance of the plaintiff's riparian rights in Lake Michigan to the Lincoln Park commissioners for the enlargement of Lincoln Park. The contract included recitals which described the park's plan in certain areas of Lake Michigan for the purposes of enlarging the park. (*Wall*, 378 Ill. at 84-85.) The preamble provided that, in consideration for those recitals and the mutual agreements of the parties and in consideration of the performance by the commissioners of the "agreements and conditions herein contained," the plaintiffs promised to convey their riparian rights. *Wall*, 378 Ill. at 91.

Later, the park district failed to carry out its original plan and adopted a substantially different plan for the same area. (*Wall*, 378 Ill. at 88.) Because the new plan would diminish the plaintiff's property value, it filed a suit for rescission of the contract. (*Wall*, 378 Ill. at 90.) The court concluded that, even though the provision for the construction of the park did not appear as an express covenant, it was the controlling condition upon which the contract to convey riparian rights was based. (*Wall*, 378 Ill. at 91-92.) Therefore, the recitals became part of the terms of the contract. *Wall*, 378 Ill. at 92.

The court in *American National Bank* (134 Ill. App. 3d at 776-77) ruled that the parties intended that the contract's recitals be an operative part of the agreement through its language that the contract was entered into "[f]or and in consideration of the premises set forth in the foregoing recitals." (*American National Bank*, 134 Ill. App. 3d at 776-77.) The recitals stated that the two parties wanted the real estate parcels developed and operated principally for their businesses, which sold and serviced home and other furnishings and fixtures. (*American National Bank*, 134 Ill. App. 3d at 774-75.) In connection with that desire, they granted reciprocal rights for the ingress, egress, and use of each of their parcels by the other, and to restrict certain of their respective commercial activities. *American National Bank*, 134 Ill. App. 3d at 773.

Highland/JGT attempts to distinguish both *Wall* and *American National Bank* because the recitals in both cases expressed the essence of the consideration for the entire agreements where the Development Agreement does not show a design of which the continuing effectiveness of the Consulting Agreement is a necessary part. Instead, Highland/JGT contends, the Development Agreement's design and purpose is for the financing, construction, leasing, and operation

of the medical center by Highland/JGT to continue, absent default, until substantial completion. Even though Highland/JGT argues that the recitals are not binding, it contends that the last of the six recitals could be considered a controlling condition upon which the agreement is based. That recital states:

"F. Owner wishes to retain Highland to perform certain services in connection with the development, financing, design, construction, management, leasing and marketing of the Property, and Highland is willing to perform such services, all in accordance with the terms and conditions of this Agreement."

■ ■ A preliminary recital, which is an explanation of the circumstances surrounding the execution of the contract, does not become a binding obligation unless so referred to in the operative portion of the instrument. (*Illinois Housing Development Authority v. M-Z Construction Corp.* (1982), 110 Ill. App. 3d 129, 145.) For a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract. (*Turner Construction Co. v. Midwest Curtainwalls, Inc.* (1989), 187 Ill. App. 3d 417, 421.) If so incorporated, those additional provisions become as much a part of the contract as if they were expressly written in it. *Turner Construction Co.*, 187 Ill. App. 3d at 421.

The Development Agreement's recitals provide:

"A. On or about July 8, 1985, John G. Wilson ('Wilson') and Gregory P. Matic ('Matic') entered into that certain Development Consulting Agreement (the 'Development Agreement'), a copy of which is attached hereto as Exhibit 'A' and incorporated herein by this reference, for the management, financing and development of the 'Property' (as hereinafter defined)."

The preamble expressly incorporates the recitals:

"NOW, THEREFORE, in consideration of the foregoing Recitals, the provisions of which are hereby incorporated herein, and the mutual promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows: ***."

■ The recitals and preamble expressly incorporate the Consulting Agreement by reference. That reference indicates an intention of the parties to incorporate the Consulting Agreement and to make it part of the Development Agreement.

Next, Highland/JGT argues that the inconsistencies between the two agreements establish that they are distinctly different contracts and cannot be read together. Highland/JGT maintains that the de-

scription in the Consulting Agreement of John Wilson's functions as project construction manager and his compensation are inconsistent with the development and management functions of Highland in the Development Agreement. Similarly, Highland/JGT claims, the Consulting Agreement's compensation for Greg Matic of $4,000 a month was inconsistent with the Development Agreement's provision for paying Highland a development fee of $325,000.

In contrast, John Wilson and Evanston Partners maintain that the two agreements are consistent and that the contract language is plain. In viewing the Development Agreement as a personal service contract, they state that it would make no sense for either party to enter into a contract which could be terminated, without penalty, only after the entire project had been completed. John Wilson and Evanston Partners claim that the differences between designating John Wilson as the project construction manager in the Consulting Agreement and Highland as such in the Development Agreement are irrelevant because the Development Agreement expressly provides that the duties of the parties may change and that the agreement was not intended to restrict those changes.

Highland/JGT also asserts that the term provisions are inconsistent. While the Consulting Agreement expressly provided:

> *"Term.* The term of this Agreement shall be for one year from date and shall be automatically extended for successive periods of one year unless terminated by written notice from a party delivered or mailed to the other party at the address set forth above (or substitute address) within 90 days' prior to the anniversary of this Agreement,"

the Development Agreement provided:

> "3. *Term: Subject to earlier termination,* the term of this Agreement shall end upon 'Substantial Completion' (as defined in the Architectural Agreement) of the 'Improvements' (as hereinafter defined)." (Emphasis added.)

Highland/JGT contends that a strong presumption arises against reading the termination provision of the Consulting Agreement into the comprehensive and detailed language of the Development Agreement because the parties could easily have included such a provision in the language of the Development Agreement, but did not. (*McWhorter v. Realty World-Star, Inc.* (1988), 171 Ill. App. 3d 588, 594.) Because the parties included specific and exhaustive language concerning the relationship between the parties but not concerning the term of the agreement, they assumed that the parties did not in-

tend the "term" provision of the Consulting Agreement to be operative along with the "term" provision of the Development Agreement.

■■ Highland/JGT's argument is without merit. The "term" paragraphs of the Consulting Agreement and Development Agreement are not inconsistent. The Consulting Agreement provides for a yearly term to be automatically extended unless terminated on 90 days' prior written notice. By incorporating that provision, as evidenced in the language, "Subject to earlier termination," the Development Agreement provides that unless previously terminated by a 90-day written notice or default, the agreement terminates on substantial completion of the project.

■■ Next, Highland/JGT asserts that it will suffer irreparable harm in the absence of a preliminary injunction. An injury is irreparable when it is of a nature that the injured party cannot be adequately compensated or when damages cannot be measured by any certain pecuniary standard. (*Falcon, Ltd. v. Corr's Natural Beverages, Inc.* (1987), 165 Ill. App. 3d 815, 821.) Highland/JGT need not show injury that is beyond repair or beyond compensation in damages, but rather, that there are transgressions of a continuing nature, of such constant and frequent recurrence that no redress can be had at law. *Greenspan*, 138 Ill. App. 3d at 300; *Sports Unlimited, Inc. v. Scotch & Sirloin of Woodfield, Inc.* (1978), 58 Ill. App. 3d 579, 583.

■■ Highland/JGT argues that it will suffer an injury that cannot be adequately and completely remedied because there is no adequate method to determine money damages and damage to its goodwill. Furthermore, Highland/JGT states, its exclusion from the project, John Wilson's operation of a competing business, and the harm to Highland/JGT's goodwill are of a continuing nature. Therefore, Highland/JGT maintains, it will suffer irreparable harm to its professional reputation, business contacts, goodwill, and competitive ability if John Wilson is not enjoined from developing the medical center to the exclusion of Highland/JGT. Highland/JGT considers the medical center project as a one-of-a-kind, special use real estate project for which it has expended a substantial amount of money and time to develop, construct, finance, lease, and manage. Highland/JGT states that its ability to perform and its reputation became its principal goodwill and the foundation to compete for similar development business in the future.

Highland/JGT's argument fails because it did not present any facts to show that it would suffer irreparable harm. Its conclusory statements regarding damage to its purported goodwill were not enough. Injunctive relief is so extraordinary that allegations of mere

opinion, conclusion, or belief are not sufficient. (*Allstate Amusement Co. v. Pasinato* (1981), 96 Ill. App. 3d 306, 308.) Facts which clearly establish that the remedy is necessary must be pleaded. *Maas v. Cohen Associates, Inc.* (1983), 112 Ill. App. 3d 191, 195.

The next issue is whether Highland/JGT has an adequate remedy at law. An adequate remedy at law is one which is clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy. (*Agrimerica, Inc. v. Mathes* (1988), 170 Ill. App. 3d 1025, 1035.) A preliminary injunction will not be granted where the plaintiff can be adequately compensated by an award of money damages. *La Salle National Bank v. Refrigerated Transport Co.* (1987), 165 Ill. App. 3d 899, 901.

Highland/JGT maintains that it lacks an adequate remedy at law because money damages will not adequately compensate it for the loss and unrealized value of its professional reputation, business contacts, and goodwill. Furthermore, Highland/JGT anticipates losing future fees and commissions because the loss would be difficult, if not impossible, to calculate with any degree of certainty. Highland/JGT notes that if the project is not successful because of the lack of Highland/JGT's participation, there will be no commissions and fees. Finally, Highland/JGT claims that it would be difficult to establish a standard for damages because the leases are unique.

Highland/JGT cites cases where there was no adequate remedy at law. The court in *Falcon, Ltd.* (165 Ill. App. 3d at 820-21) ruled that there was no adequate remedy at law because the injury to plaintiff's reputation and goodwill, and the resulting loss of existing and future business, was incalculable even though immediate damages in loss of commissions may be calculable. The court reasoned that the plaintiff had spent substantial time and effort in developing the distribution network through which the defendants could sell their beverages. (*Falcon, Ltd.*, 165 Ill. App. 3d at 821.) By directly billing the plaintiffs' subdistributors and receiving and filling orders without plaintiffs' consent, the defendant interfered with plaintiffs' contractual and prospective relationships with their subdistributors to the extent that damages could not be ascertained with any certainty. *Falcon, Ltd.*, 165 Ill. App. 3d at 821.

In *Agrimerica, Inc.* (170 Ill. App. 3d at 1035), the court ruled that even though lost profits are often calculable, they would not compensate for the loss of competitive position sustained during the several weeks before Agrimerica discovered the ex-employee was attempting to lure its customers away. Furthermore, the court stated, any continued contracts by the ex-employee could result in damage extending

far beyond the time restriction enunciated in the covenant because the evidence showed that two years was needed to solidify initial customer relationships. *Agrimerica, Inc.*, 170 Ill. App. 3d at 1035.

In *U-Haul Co. v. Hindahl* (1980), 90 Ill. App. 3d 572, 577, the court distinguished between immediate damages and loss of sales, which may be calculable, and injury to the plaintiff's reputation and goodwill and the resulting potential loss of future business, which are incapable of adequate computation.

In affirming the preliminary injunction in *Eagle Books, Inc. v. Jones* (1985), 130 Ill. App. 3d 407, 411, the court ruled that there was no adequate remedy at law because the potential loss of future customers and revenues was incapable of adequate computation of damages even though immediate damages in loss of sales may be calculable.

Evanston Partners correctly points out that Highland/JGT's allegations that John Wilson or Evanston Partners may not properly develop the medical center or that Evanston Partners may not have adequate assets to pay the commissions or fees are without factual support in the record and should be disregarded. A reviewing court considers only those documents and arguments which pertain to the appellate court record and disregards all extemporaneous documents and comments by either party that are not supported by the record. *McCutcheon v. Chicago Principals Association* (1987), 159 Ill. App. 3d 955, 958.

John Wilson and Evanston Partners assert that Highland/JGT's action is one for money damages arising out of an alleged breach of the Development Agreement. Therefore, an award of money damages could fairly and adequately compensate Highland/JGT. They argue that Highland/JGT calculated its alleged damages in its verified motion for a preliminary injunction. Even though these calculations did not include any fees or commissions for future work, Evanston contends that the Development Agreement sets forth exactly how the fees and commissions are to be calculated. Therefore, they argue that the damages are capable of being measured and corrected by an award of money damages.

John Wilson and Evanston Partners cite numerous cases that ruled an adequate remedy at law existed. In *La Salle National Bank* (165 Ill. App. 3d at 901), the landlord was not entitled to injunctive relief to enforce the lease agreement because the lease agreement provided for money damages and the complaint showed that there was an adequate remedy at law in the form of monetary recovery. *La Salle National Bank*, 165 Ill. App. 3d at 901.

In *Best Coin-Op, Inc. v. Old Willow Falls Condominium Association* (1983), 120 Ill. App. 3d 830, 835, the court refused to issue a preliminary injunction because any monetary loss which the plaintiff suffered could be calculated with a great deal of certainty. The court was not concerned with future losses that would occur if it was determined that the defendant had breached the agreement. (*Best Coin-Op*, 120 Ill. App. 3d at 835.) Instead, it was concerned with any possible loss until a final determination on the merits. (*Best Coin-Op*, 120 Ill. App. 3d at 835.) Because the laundry facilities were being operated by another party, damages could be calculated on any gross receipts during that period. *Best Coin-Op*, 120 Ill. App. 3d at 835.

The court reversed the preliminary injunctions in *Handy Andy Home Improvement Centers, Inc. v. American National Bank & Trust Co.* (1988), 177 Ill. App. 3d 647. After the bank entered into a written 30-year lease agreement that gave Handy Andy the exclusive right to operate a home improvement center at the shopping center, the landlord rented space in the shopping center to Cabinet Wholesalers, which would sell kitchen cabinets and bathroom fixtures. (*Handy Andy*, 177 Ill. App. 3d at 649-50.) Handy Andy contacted the bank, which padlocked the Cabinet Wholesalers store and terminated the lease. (*Handy Andy*, 177 Ill. App. 3d at 650.) Cabinet Wholesalers was granted a preliminary injunction prohibiting the bank from interfering with its access and use of the store. (*Handy Andy*, 177 Ill. App. 3d at 650.) Subsequently, Handy Andy was denied a preliminary injunction to enjoin the bank from interfering with its exclusive right to sell home improvement items at the shopping center. *Handy Andy*, 177 Ill. App. 3d at 651.

The court reversed Cabinet Wholesalers' injunction, ruling that Cabinet Wholesalers had an adequate remedy at law. (*Handy Andy*, 177 Ill. App. 3d at 653.) If they ultimately were granted specific performance under the lease and were allowed to take possession, evidence of lost profits could be used to establish damages. (*Handy Andy*, 177 Ill. App. 3d at 653.) If they prevailed at trial, but were not granted specific performance, they could establish damages through evidence of expenditures in preparing the store for operation and any lost profits suffered as a result of being denied possession pending trial. *Handy Andy*, 177 Ill. App. 3d at 653.

The court also reversed the denial of Handy Andy's request for preliminary injunction because there was no adequate remedy at law. (*Handy Andy*, 177 Ill. App. 3d at 655.) Not only would it be difficult to ascertain a loss of sales attributable to the competitor's operation, but it would also be very difficult to determine the negative effect the

lost sales of kitchen and bathroom products would have on other items sold in the store. *Handy Andy*, 177 Ill. App. 3d at 654.

■ Although it may be complicated to ascertain the amount of damages that may exist, Highland/JGT did not demonstrate that it would be impossible. Its anticipated fees and commissions would be calculated based on a percentage of Highland/JGT's performance of specialized development work, financing, management, and sale of individual leases. Therefore, the trial court did not err in finding that Highland/JGT had an adequate remedy at law.

■ Finally, in balancing the equities, the court must weigh the inconveniences to the parties and the public to determine whether granting the injunction would cause less disturbance to the defendant's position than the denial would to the plaintiff's position. (*Sports Unlimited*, 58 Ill. App. 3d at 583.) The trial court concluded that there would be more harm done by entering the preliminary injunction, thus preventing the medical center project from continuing, than would be done by not entering the order. We agree. Maintaining the status quo is more important in this case.

It is in the discretion of a trial court to grant or deny a preliminary injunction, and a reviewing court cannot reverse that ruling unless the lower court abuses its discretion by being against the manifest weight of the evidence. (*American National Bank*, 134 Ill. App. 3d at 777.) It is not the purpose of a preliminary injunction to decide controverted facts or the merits of the case. (*Baal*, 97 Ill. App. 3d at 500.) A reviewing court may consider substantive issues only as necessary to determine whether the trial court acted within its authority. (*American National Bank*, 134 Ill. App. 3d at 777.) Because the denial of the preliminary injunction was not against the manifest weight of the evidence, the trial court did not abuse its discretion.

Based on the foregoing, the judgment of the circuit court should be affirmed.

Affirmed.

WHITE* and GREIMAN, JJ., concur.

---

*Justice White concurred with this opinion prior to his retirement.

Justice Freeman heard the oral argument in this case prior to his election to the Illinois Supreme Court. Justice Greiman was substituted, and he reviewed the briefs and the record and agreed with the decision.