**ATLANTIC MUTUAL INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**METRON ENGINEERING AND CONSTRUCTION COMPANY, Defendant–Appellee.**

No. 95–2815.

United States Court of Appeals, Seventh Circuit.

Argued March 28, 1996.

Decided May 13, 1996.

Daniel A. Celske, Sanchez & Daniels, Chicago, IL, Daniel Q. Harrington (argued), Scott M. Waldman, Philadelphia, PA, for plaintiff-appellant.

Edward M. Kay, James T. Ferrini, Susan Condon, Imelda Terrazino (argued), Clausen, Miller, Gorman, Caffrey & Witous, Chicago, IL, for defendant-appellee.

Before BAUER, ESCHBACH, and FLAUM, Circuit Judges.

ESCHBACH, Circuit Judge.

On December 4, 1992, general contractor Metron Engineering and Construction Company (hereinafter "Metron") entered into a contract with the Intercommunity Charitable Trust (hereinafter "ICT") to provide "reha-

bilitation work" at 6259 North Broadway in Chicago, Illinois, a premises owned by ICT.[1] Unfortunately, a fire severely damaged the project on February 17, 1993, while Metron was working at the site. ICT's insurance carrier, Atlantic Mutual Insurance Company (hereinafter "Atlantic"), paid to ICT approximately $620,000 for damage resulting from the fire. Because it compensated ICT for the loss, Atlantic became duly subrogated to ICT's claims against third parties regarding the fire.

Invoking diversity jurisdiction, Atlantic (a New York corporation) filed suit in federal district court in the Northern District of Illinois against Metron (an Illinois corporation) for fire-related damages under theories of negligence, breach of contract, and breach of express and implied warranties. Metron filed a motion for summary judgment arguing that the agreement between Metron and ICT incorporates by reference document A201/CM (1980 edition) from the American Institute of Architects (hereinafter "A201/ CM"). A201/CM, entitled "General Conditions of the Contract for Construction" contains a "waiver of subrogation" provision at Article 11.3.6. According to Metron, because A201/CM is incorporated by reference, Atlantic is precluded from bringing its subrogated claim.

Atlantic responded that A201/CM is not, in fact, a part of the agreement between Metron and ICT because A201/ CM was neither attached to the Metron/ICT agreement nor expressly enumerated as a contract document as required under Article 7 of the agreement. Indeed Atlantic contended that Metron never provided to ICT a copy of A201/CM. According to Atlantic, the Metron/ICT agreement is at least ambiguous regarding A201/CM; the meaning of the contract is a factual question.

The district court concluded as a matter of law that A201/CM is incorporated in the Metron/ICT agreement and that Atlantic is precluded from bringing suit as ICT's subrogee. Atlantic brings this timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**I.**

After considering the Metron/ICT agreement as a "whole," the district court held that "it is clear that the parties intended the General Conditions [A201/CM] to be part of the Contract." Reviewing the district court's decision *de novo* and considering the record in the light most favorable to Atlantic, we respectfully disagree.

Under Illinois law [2] our point of departure is the contract itself. *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987). If the plain language of the contract resolves the dispute, our analysis necessarily ends. *Id.* Therefore, we turn to the plain language contained within the "four corners" of the Metron/ICT contract (hereinafter "the agreement"). *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill.App.3d 31, 195 Ill.Dec. 701, 704, 628 N.E.2d 1165, 1168 (Ill.App.Ct. 1993).

**A. The plain language of the agreement.**

Although Metron technically drafted the agreement, we are being charitable in calling Metron the "drafter." Metron actually obtained a copy of document A101/CM (1980 edition) from the American Institute of Architects (hereinafter "A101/CM"), and filled in the blanks. Because the agreement is actually A101/CM as modified or completed by Metron, it contains instructional language and boilerplate provisions that needlessly complicate our analysis.

The agreement features the following heading in large bold print: "**Standard Form Agreement Between Owner and Contractor.**" Below the heading, in much smaller print, are the following instructions to persons using A101/ CM: "This document has important legal consequences; consultation with an attorney is encouraged. This document is intended to be used in conjunction with AIA Documents A201/CM, 1980; B141/CM, 1980; and B801, 1980." Following the heading appears "AGREEMENT," suggesting that all language subsequent constitutes the agreement between the parties.

---

**1.** Metron drafted the contract, which totaled five pages.

**2.** The parties agree that Illinois law governs the resolution of this dispute.

Article 1 of the agreement, entitled "The Contract Documents," appears to be an incorporation clause describing those documents that can constitute part of the contract. Article 1 provides in relevant part:

> The Contract Documents consist of this Agreement, the Conditions of the Contract (General, Supplementary and other Conditions), the Drawings, the Specifications, all Addenda issued prior to and all Modifications issued after execution of this Agreement. These form the Contract, and all are as fully a part of the Contract as if attached to this Agreement or repeated herein. An enumeration of the Contract Documents appears in Article 7.

Article 7 of the agreement, entitled "Miscellaneous Provisions," appears to be an enumeration clause, giving the parties an opportunity to list those documents that constitute the contract. Article 7 provides in relevant part as follows:

> 7.1 Terms used in the Agreement which are defined in the Conditions of the Contract shall have the meanings designated in those Conditions.
>
> 7.2 The Contract Documents, which constitute the entire agreement between the Owner and the Contractor, are listed in Article 1 and, except for Modifications issued after execution of this Agreement, are enumerated as follows:
>
> (List below the Agreement, the Conditions of the Contract [General, Supplementary and Other Conditions], the Drawings, the Specifications, and any Addenda and accepted alternates, showing page or sheet numbers in all cases and dates where applicable.)

Twenty-three documents, drawings, and modifications are listed under Article 7.2. Noticeably absent from the list is any mention of A201/CM or "General Conditions of the Contract for Construction."

### B. The agreement's heading.

■ Ruling in favor of Metron, the district court concluded that the agreement incorporated A201/CM by reference. First, the district court reasoned that the instructional language "This document is intended to be used ... with ... A201/CM ..." following the heading "plainly indicates" that the agreement is to be read with A201/CM. We disagree. If anything, the language relied upon by the district court is an instruction to those persons using A101/CM. The language informs the user that the American Institute of Architects has created a document that can be used in conjunction with A101/CM to provide general conditions. Under Illinois law introductory language or recitals are not binding obligations "unless so referred to in the operative portion of the instrument as to show a design that they should form a part of it." *Illinois Housing Dev. Auth. v. M–Z Const. Corp.*, 110 Ill.App.3d 129, 65 Ill.Dec. 665, 675, 441 N.E.2d 1179, 1189 (Ill.App.Ct. 1982). Nothing in the body of the agreement requires that the parties incorporate A201/ CM, or indicates that the parties themselves have chosen to do so.

Further, to treat the introductory language as incorporating A201/CM would produce a bizarre result. The introductory language similarly refers to documents B141/ CM and B801 from the American Institute of Architects. B141/CM is entitled "Standard Form of Agreement Between Owner and Architect." B801 is entitled "Standard Form Agreement Between Owner and Construction Manager." We find absolutely no evidence to suggest that either Metron or ICT meant to incorporate an architect and a management agreement into the agreement they signed on December 4, 1992. Yet were we to adopt the district court's interpretation of the introductory language, B141/CM and B801 would be incorporated by reference. The law of Illinois prevents such illogical interpretations.[3] *See Omnitrus Merging Corp.*, 195 Ill.Dec. at 706, 628 N.E.2d at 1170.

---

**3.** We do not mean to suggest that the district court's reasoning is absurd. On the contrary, in the absence of Illinois precedent on point the district court turned to the holdings of other states. Specifically, the district court relied on *Southwest Nat'l Bank v. Simpson and Son, Inc.*, 14 Kan.App.2d 763, 799 P.2d 512, 518–19 (1990); *Walker v. V. & V. Const. Co., Inc.*, 28 Mass.App.Ct. 908, 545 N.E.2d 1192 (1989); and *Jim Carlson Constr., Inc. v. Bailey*, 769 S.W.2d 480 (Mo.App.1989). *Southwest Nat'l Bank, Walker*, and *Jim Carlson Constr.* all interpret prior versions of A101/CM to incorporate A201/CM. We see no need to opine as to the reasoning

## C. Article 1.

The district court also relied on the incorporation language in Article 1 of the agreement to conclude that "Article 1 definitely states that the General Conditions are a part of the contract as if attached." The district court clearly based it determination on the following portion of Article 1: "The Contract Documents consist of this Agreement, the Conditions of the Contract (General, Supplementary and other conditions). . . ." We disagree with the district court's interpretation.

The very language upon which the district court relied demonstrates the first basis for our disagreement. Article 1 specifically refers to "Conditions of the Contract (General, Supplementary and other conditions)." Assuming arguendo that this language incorporates A201/CM, the plain language of A201/CM demonstrates that A201/CM provides only "General Conditions of the Contract for Construction." The puzzle presented by the district court's interpretation is obvious. If A201/CM provides the "General" conditions of the contract, where are the "Supplementary" and "other" conditions also expressly mentioned in Article 1? We cannot find them anywhere. Were we to adopt the district court's interpretation of Article 1, we would necessarily be incorporating additional documents that apparently do not exist.

What is more, nothing in Article 1 refers to A201/CM. Article 1 only refers to "Conditions of the Contract." As we noted above, there is no requirement that contracting parties using A101/CM incorporate A201/CM as the parties' general conditions. The American Institute of Architects intends for parties to do so. But there is no evidence in Article 1 that either Metron or ICT intended to do so. Metron and ICT were free to incorporate any "General, Supplementary and other" conditions that they so desired. The only indication in Article 1 regarding which specific documents are incorporated in the agreement is the following language: "An enumeration of the Contract Documents appears in Article 7." Thus, our analysis turns to Article 7.

## D. Article 7: The agreement's ambiguity.

█ In its analysis of Article 7, the district court noted that Article 7.2 "states that the contract documents which constitute the entire agreement between the parties are listed in Article 1. The General Conditions are listed in Article [1]." Therefore, the district court reasoned, the "General" conditions are incorporated in Article 7 by reference to Article 1. We agree with the district court that the references in Article 7 to "Conditions of the Contract" and Article 1 must have some purpose. "[I]t is presumed that every clause in the contract was inserted deliberately and for a purpose. . . ." *Wilson v. Illinois Benedictine College*, 112 Ill.App.3d 932, 68 Ill.Dec. 257, 263, 445 N.E.2d 901, 907 (Ill.App.Ct.1983). However, we cannot determine that purpose as a matter of law.

Article 7.1 makes clear that terms contained in the agreement are defined in the "Conditions of the Contract." This reference strongly suggests that, in fact, the parties did rely on an extraneous document entitled "Conditions of the Contract." However, because Article 7.1 makes no mention of either "General" conditions or A201/CM, we are still unsure whether that document is A201/CM.

The reference in Article 7.2 to Article 1 presents an additional conundrum. Article 7.2 provides that "[t]he Contract Documents, which constitute the entire agreement . . . are listed in Article 1. . . ." What does this phrase mean? It appears to refer us back to Article 1 for an enumeration of the contract documents. As we have noted, Article 1 expressly refers to "Conditions of the Contract (General, Supplementary and other Conditions)" but then directs the reader to Article 7 for clarification. Yet when we turn to Article 7, we are referred back to Article 1.

One palatable—and seemingly obvious—resolution to this quagmire is to turn to the

---

underlying these opinions. Rather it is sufficient to note that *Southwest Nat'l Bank*, *Walker*, and *Jim Carlson Constr.* all rely in large part on language which was included in prior versions of A101/CM requiring that A101/CM could be used

"only with the 1976 edition of AIA document A201, General Conditions for Construction." The 1980 version of A101, the version at issue in this case, does not contain such specific language.

enumeration clause also contained in Article 7 and hold that only those documents specifically enumerated are part of the contract. Unfortunately, the solution is not so simple. Article 7.2 expressly provides that all "Contract Documents" that collectively constitute the agreement, including the agreement itself, shall be listed. Although twenty-three items are listed, neither the agreement nor A201/CM is among them.

Two inferences can be drawn from the parties' failure to list the agreement itself. First, we could conclude that because the agreement itself is not listed under Article 7.2, it is not part of the agreement between the parties. Therefore, the entire contract is void. Such a conclusion is, of course, silly. The very existence of the agreement suggests that the parties intended to contract.

The second possible inference is that the documents enumerated under Article 7.2 do not constitute an exhaustive list of those documents which form the entire agreement. We find this inference far more tenable. However, we are left right back where we started: unable to garner from Article 7 whether it incorporates "General" conditions and, if so, whether A201/CM provides those conditions.

Article 7 expressly refers to definitions contained in the "Conditions of the Contract." Article 7 also expressly refers to Article 1, and Article 1 expressly refers to "General" conditions. A fact finder could reasonably conclude that the parties intended to incorporate "General" conditions. Parol evidence may demonstrate that A201/CM provides those conditions. On the other hand, a fact finder could also conclude that the parties' failure to enumerate either A201/CM or "General" conditions under Article 7.2 evinces an intent not to include A201/CM. Because either interpretation is reasonable and fair, we are forced to conclude as a matter of law that the contract is ambiguous. *Omnitrus Merging Corp.*, 195 Ill.Dec. at 704, 628 N.E.2d at 1168. The resolution of the ambiguity is a question of fact for the jury. *Id.*

## II.

The district court also reasoned that "reading the Contract as if the General Conditions were not incorporated would not be reasonable.... Without them, the parties would not have a complete agreement." The district court's rationale is as follows. The Metron/ICT agreement is brief; it totals five pages. A201/CM totals twenty-one pages and includes several elaborations that would add specificity to the Metron/ICT agreement. The additional elaboration provided in A201/CM adds an element of "completeness" to the agreement that any reasonable person would want. Therefore, according to the district court, the parties must have meant to incorporate it.

Although we understand the district court's reasoning, we believe that it runs counter to traditional principles of contract interpretation. Nothing evinces that the agreement, considered in conjunction with the documents enumerated under Section 7.2, is necessarily incomplete. The district court essentially relied on the language of A201/ CM to conclude that A101/CM, standing alone, is unreasonably brief.

It is true that we examine the "entire text of the agreement," *LaSalle*, 827 F.2d at 79, "reviewing each part in light of the others." *Wilson v. Wilson*, 217 Ill. App.3d 844, 160 Ill.Dec. 752, 756, 577 N.E.2d 1323, 1327 (Ill.App.Ct.1991). However, in the context of a summary judgment motion we cannot rely on an alleged incorporated document to conclude that an otherwise complete agreement is inadequate. The very purpose of our inquiry is to determine whether A201/CM is incorporated. When determining under Illinois law whether something is incorporated into a contract, we limit our inquiry to the four corners of the contract. *See id.* at 758, 577 N.E.2d at 1329 ("For a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract.").

When considering whether a contract incorporates a document by reference, the alleged incorporated document is extrinsic evidence. A court may consider extrinsic

evidence only if the contract itself is ambiguous. *LaSalle,* 827 F.2d at 78. In the foregoing analysis we have determined that ambiguity exists regarding whether A201/CM is incorporated. Therefore, the parties may present parol evidence including A201/CM. *Id.* But the parties must present their evidence to a trier of fact; the issue is inappropriate for resolution on summary judgment. *Id.*

### Conclusion.

We conclude that the Metron/ICT agreement is ambiguous regarding whether it incorporates by reference document A201/CM. The district court's conclusion to the contrary is reversed. This case is remanded to the district court for further proceedings consistent with this opinion.[4]

REVERSED AND REMANDED.

---

4. In its reply brief Atlantic discussed for the first time a case neither cited nor discussed in its initial brief. Metron moved this court to strike that portion of Atlantic's brief. In considering this case the court did not rely on the portion of Atlantic's brief in dispute. Therefore, Metron's motion is moot.